DocuSign Envelope ID: FE1D5D19-CF05-4969-9915-E8BD743D1463
Case 23-04789    Doc 40-2    Filed 09/28/23    Entered 09/28/23 17:18:04    Desc Exhibit
2 - Listing Agreement    Page 1 of 6

MAINSTREET ORGANIZATION OF REALTORS®
RESIDENTIAL EXCLUSIVE RIGHT TO SELL MARKETING AGREEMENT

1  **Infiniti Properties Inc** | **Galeb Mizyed**
2  BROKERAGE (Print Listing Office Name) | SELLER NAME (Print)
3  **Mark mcGee**
4  MANAGING BROKER NAME (Print) | SELLER NAME (Print)
5  **Ghalia AbuArab**
6  DESIGNATED AGENT NAME (Print)

7  Seller represents and warrants that title to the property is in the name of: **Galeb Mizyed**
8  and Seller has the authority to sell the Property.

9  **1. Property:** This Agreement is between the above-mentioned Brokerage and Seller, in consideration of their acceptance of the
10 terms hereof and, efforts of Brokerage's to advertise, market, promote, and sell the real estate commonly known as:
11 Address: **13890 Creek Crossing Dr**,
12 Unit No: **-----**, City: **Orland Park**,
13 County: **Cook**, State: **IL**, Zip Code: **60467**,
14 Permanent Index No.: **07-06-206-0000**, hereinafter referred to as "Property."

15 **If Designated Parking is Included:** # of space(s) ____; identified as space(s) # _____; location _____
16 *[CHECK TYPE]* ☐ deeded space, PIN: _____ ☐ limited common element ☐ assigned space.
17 **If Designated Storage is Included:** # of space(s) ____; identified as space(s) # _____; location _____
18 *[CHECK TYPE]* ☐ deeded space, PIN: _____ ☐ limited common element ☐ assigned space.

19 **2. Term and Conditions:** The term of this Agreement begins 12:01 A.M. Month: **July** Day: **10th**
20 Year: **2023** and terminates 11:59 P.M. Month: **January** Day: **10th** Year: **2024**
21 ("marketing period"). Seller gives Brokerage the exclusive right to market, sell, option, or exchange the Property to qualified
22 purchasers and to share the Property with participants in the Midwest Real Estate Database, LLC, and/or any other Multiple Listing
23 Service in which Managing Broker is a participant, in accordance with the applicable rules and regulations of that Multiple Listing Service.
24 (**GM**/____) **THE PARTIES UNDERSTAND AND AGREE THAT IT IS ILLEGAL FOR EITHER OF THEM TO**
25 *[SELLER(S) INITIALS]* **DISCRIMINATE AGAINST ANY PROSPECTIVE BUYER OR LESSEE ON THE BASIS OF RACE,**
26 **AGE, COLOR, RELIGION, SEX, ANCESTRY, ORDER OF PROTECTION STATUS, GENDER IDENTITY, MARITAL**
27 **STATUS, PHYSICAL OR MENTAL HANDICAP, FAMILIAL STATUS, NATIONAL ORIGIN, SEXUAL**
28 **ORIENTATION, MILITARY STATUS, DISHONORABLE DISCHARGE FROM THE MILITARY SERVICE, OR ANY**
29 **OTHER CLASS PROTECTED BY THE ILLINOIS HUMAN RIGHTS ACT. THE PARTIES AGREE TO COMPLY**
30 **WITH ALL APPLICABLE FEDERAL, STATE, AND LOCAL FAIR HOUSING LAWS.**

31 **3. Marketing Price:** The price shall be $ ~~995,000~~ **$1,079,000**

32 **4. Possession:** Possession is to be negotiated at time of sales contract.

33 **5. Fixtures and Personal Property:** All of the fixtures and personal property stated herein are owned by Seller and, to the best of
34 Seller's knowledge, are in operating condition unless otherwise noted. Seller agrees to transfer to buyer all fixtures, all heating,
35 electrical, and plumbing systems together with the following items of personal property by Bill of Sale (Check or enumerate applicable items):

36 ☒ Refrigerator              ☐ Wine/Beverage Refrigerator   ☒ Light Fixtures, as they exist   ☐ Fireplace Gas Log(s)
37 ☒ Oven/Range/Stove          ☒ Sump Pump(s)                 ☒ Built-in or attached shelving   ☒ Smoke Detectors
38 ☒ Microwave                 ☐ Water Softener (unless rented) ☐ All Window Treatments & Hardware ☒ Carbon Monoxide Detectors
39 ☒ Dishwasher                ☒ Central Air Conditioning     ☐ Satellite Dish                  ☐ Invisible Fence System, Collar & Box
40 ☒ Garbage Disposal          ☐ Central Humidifier           ☐ Wall Mounted Brackets (AV/TV)   ☐ Garage Door Opener(s)
41 ☐ Trash Compactor           ☐ Central Vac & Equipment      ☐ Security System(s) (unless rented)   with all Transmitters
42 ☒ Washer                    ☒ All Tacked Down Carpeting    ☐ Intercom System                 ☐ Outdoor Shed
43 ☒ Dryer                     ☒ Existing Storms & Screens    ☐ Electronic or Media Air Filter(s) ☐ Outdoor Playset(s)
44 ☐ Attached Gas Grill        ☐ Window Air Conditioner(s)    ☐ Backup Generator System         ☒ Planted Vegetation
45 ☒ Water Heater              ☒ Ceiling Fan(s)               ☒ Fireplace Screens/Doors/Grates  ☒ Hardscape

46 **Other items included**: _____
47 **Items NOT included**: _____
48 Unless otherwise agreed to in writing by Seller and Buyer, Seller shall warrant to Buyer that all fixtures, systems and personal
49 property included in this Agreement shall be in operating condition at possession, except: _____
50 _____. A system or item shall be deemed to be in operating condition if it performs
51 the function for which it is intended, regardless of age, and does not constitute a threat to health or safety.

52 **6. Home Warranty:** Seller shall agree to provide to Buyer a limited home warranty program from _____
53 _____ at a charge of $ _____. Seller acknowledges that a home
54 warranty program is a limited warranty with a deductible. (STRIKE THROUGH IF NOT OFFERED.)

55 **7. Seller's Designated Agent(s):** Managing Broker designates and Seller accepts: **Ghalia AbuArab**
56 ("Seller's Designated Agent(s)"), a licensee affiliated with Managing Broker, as the only legal agent of Seller to market and sell
57 Seller's Property. Managing Broker reserves the right to appoint additional designated agents for Seller when, in Managing Broker's

**MM** *Managing Broker Initial*    **GM** *Seller Initial* ____ *Seller Initial*
Address: **13890 Creek Crossing Dr, Orland Park IL 60467**

58  discretion, it is necessary. If additional designated agents are appointed, Seller shall be informed in writing within a reasonable time
59  of such appointment. Seller authorizes Seller's Designated Agent(s), from time to time, to allow another licensee, who is not an
60  agent of the Seller, to conduct an open house of Seller's Property or provide similar support to Designated Agent(s) in the marketing
61  of Seller's Property. Seller understands and agrees that this Agreement is a contract for Brokerage to market and sell Seller's Property
62  and that Seller's Designated Agent(s) is the only legal agent of Seller. Seller's Designated Agent(s) will be primarily responsible for
63  the direct marketing and sale of Seller's Property. The duties owed to Seller as referred in the Illinois Real Estate License Act of
64  2000, as amended, will only be owed to Seller by the Designated Agent(s). The Managing Broker and the Designated Agent(s) will
65  have only those duties to the Seller as are required by statute.

66  **8. Possible Dual Agency:**  The above named Designated Agent(s) (hereinafter sometimes referred to as "Licensee") may undertake
67  a dual representation (represent both the seller or landlord and the buyer or tenant) for the sale or lease of the Property. Seller
68  acknowledges he was informed of the possibility of this type of representation.  Before signing this document, Seller must read the following:
69  Representing more than one party to a transaction presents a conflict of interest, since both clients may rely upon Licensee's advice
70  and the clients' respective interests may be adverse to each other. Licensee will undertake this representation only with the written
71  consent of ALL clients in the transaction. Any agreement between the clients as to a final contract price and other terms is a result
72  of negotiations between the clients acting in their own best interests and on their own behalf.  Seller acknowledges that Licensee has
73  explained the implications of dual representation, including the risks involved, and understands that he has been advised to seek
74  independent advice from advisors or attorneys before signing any documents in this transaction.
75  WHAT A LICENSEE CAN DO FOR CLIENTS WHEN ACTING AS A DUAL AGENT:
76      1.  Treat all clients honestly.
77      2.  Provide information about the Property to the buyer or tenant.
78      3.  Disclose all latent material defects in the Property that are known to Licensee.
79      4.  Disclose financial qualification of the buyer or tenant to the Seller or landlord.
80      5.  Explain real estate terms.
81      6.  Help the buyer or tenant to arrange for Property inspections.
82      7.  Explain closing costs and procedures.
83      8.  Help the buyer compare financing alternatives.
84      9.  Provide information about comparable properties that have sold so both clients may make educated decisions on what price
85          to accept or offer.
86  WHAT A LICENSEE CANNOT DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT:
87      1.  Confidential information that Licensee may know about the clients, without the client's permission.
88      2.  The price or terms the seller or landlord will take other than the listing price without permission of the seller or landlord.
89      3.  The price or terms the buyer or tenant is willing to pay without permission of the buyer or tenant.
90      4.  A recommended or suggested price or terms the buyer or tenant should offer.
91      5.  A recommended or suggested price or terms the seller or landlord should counter with or accept.
92  **If Seller is uncomfortable with this disclosure and dual representation, please let Licensee know. Seller is not required to**
93  **accept this section unless Seller wants to allow the Licensee to proceed as a Dual Agent in this transaction.**

94  [X]       [ ]
95  **Yes**       **No**
96  _GM_/_____) *[SELLER(S) INITIALS]*
97  By checking "Yes" and initialing, Seller acknowledges that Seller has read and understands this section and voluntarily consents to
98  the Licensee acting as a Dual Agent (that is, to representing BOTH the Seller or landlord and the buyer or tenant) should that become necessary.
99  **9. Representation of Buyers:**  Seller acknowledges that Seller has been informed and understands that as part of Brokerage's real
100 estate business, Brokerage, from time to time, enters into representation agreements with buyers, and, as such, may designate certain
101 of its licensees as exclusive buyers' representatives for the purpose of showing and negotiating the purchase of real estate listed with
102 Brokerage or other real estate brokerage firms.
103 **10. Buyer Confidentiality:**  Seller understands that Brokerage, Managing Broker and/or Designated Agent(s) may have previously
104 represented a buyer who is interested in Seller's Property. During that representation, Managing Broker and/or Designated Agent(s)
105 may have learned material information about the Buyer that is considered confidential. Under the law, neither Managing Broker nor
106 Designated Agent(s) may disclose any such confidential information to Seller even though the Managing Broker and/or Designated
107 Agent(s) now represent the Seller.
108 **11. Managing Broker's Affiliates:**  Seller understands and agrees that other licensees affiliated with Brokerage, may represent the
109 actual or prospective buyer of Seller's Property. Further, Seller understands and agrees that if the Property is sold through the efforts
110 of a licensee affiliated with Brokerage that represents the buyer, the other licensee affiliated with Brokerage will be acting as a
111 buyer's representative.
112 **12. Consent to Represent Other Sellers:**  Seller understands and agrees that Brokerage, Managing Broker and Designated Agent(s)
113 may from time to time represent or assist other sellers who may be interested in selling their property to buyers. The Seller consents
114 to Brokerage, Managing Broker's and Designated Agent's(s') representation of such other sellers before, during, and after the
115 expiration of this Exclusive Marketing Agreement and expressly waives any claims including but not limited to breach of duty or
116 breach of contract based solely upon Brokerage, Managing Broker's or Designated Agent's(s') representation or assistance of other
117 sellers who may be interested in selling their property to buyers.

_MM_ *Managing Broker Initial*               _GM_ *Seller Initial* _____ *Seller Initial*

*Address:* **13890 Creek Crossing Dr, Orland Park IL 60467**

*(Page 2 of 6 ) 6.2019 – © MAINSTREET ORGANIZATION OF REALTORS®*

118 **13. Brokerage Fee:** Except as provided hereafter, in consideration of the obligations of the Brokerage, the Seller agrees:
119 a) To pay Brokerage, at the time of closing of the sale of the property, or the initial closing of an installment contract for deed, and
120 from the disbursement of the proceeds of said sale, compensation in the amount of, for Brokerage's services, $ _____
121 and/or ~~5~~ **4%** % of the sale price in effecting the sale by finding a Buyer ready, willing, and able to purchase the property.
122 In the event that a cooperating brokerage is involved in the transaction, the commission shall be distributed ~~2.5~~ **2** % plus
123 $ **395** of the sales price to the listing brokerage and ~~2.5~~ **2** % minus $ **395** of the sales price to the
124 cooperating brokerage. If the transaction shall not be closed because of refusal, failure, or inability of the Seller to perform, the
125 Seller shall pay the sales commission in full to Brokerage upon demand. Should a sale be in pending or contingent status at the
126 expiration of this Agreement, Seller shall pay Brokerage the full commission set forth upon closing of said sale.
127 b) To pay Brokerage the commission specified above if Brokerage procures a buyer, if the Property is sold within said time by Seller
128 or any other person, or if the property is sold within **180** days from the expiration date herein to any prospect to whom the said
129 listing information was submitted during the term of this exclusive agreement. However, Seller shall not be obligated to pay said
130 commission if a valid, written listing agreement is entered into during the term of said protection period with another brokerage
131 and the sale of the Property is made during the term of the subsequent listing agreement.
132 Special Compensation Information: _____

133 **14. Cooperation and Compensation:** Brokerage is authorized to show the Property to prospective buyers through cooperating
134 brokers; and Brokerage, on a case-by-case basis, may pay a part of its brokerage commission to cooperating brokerages. Brokerage
135 is authorized, in its sole discretion, to determine with which brokerages it will cooperate and the amount of compensation that it will
136 offer cooperating brokerages in the sale of Seller's Property. Seller acknowledges that the compensation offered to such cooperating
137 brokerages may vary from brokerage to brokerage.

138 **15. Office Website Policy:** Brokerage operates a Virtual Office Website ("VOW") and/or Broker Reciprocity Internet Data
139 Exchange ("IDX") for the purpose of marketing properties to consumers on the Internet who have established a brokerage-consumer
140 relationship, as defined by Illinois Real Estate License Act of 2000, as amended, giving the consumer the opportunity to search for
141 active and closed listing data, subject to Brokerage's oversight, supervision and accountability. The VOW Policy states that a VOW
142 shall not display listings or property addresses of any seller who has affirmatively directed the brokerage to withhold the seller's
143 listing or property address from display on the Internet. A VOW may allow third parties to write comments or reviews about
144 particular listings or display a hyperlink to such comments or review in immediate conjunction with particular listings or display an
145 automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing. The
146 Policy allows the Brokerage to disable or discontinue, at Seller's request, either or both of the aforementioned VOW features (display
147 of listing and display of listing address and ability to make comments or display estimate of market value).
148 **WITH REGARD TO THE VOW POLICY, SELLER HEREBY DIRECTS BROKERAGE AS FOLLOWS (Initial that apply):**
149 (_____/_____) *[SELLER(S) INITIALS]* I do NOT want the Property listing to be displayed on the Internet.
150 (_____/_____) *[SELLER(S) INITIALS]* I do NOT want the Property address to be displayed on the Internet.
151 (_____/_____) *[SELLER(S) INITIALS]* I do NOT give permission for comments or reviews on my listing.
152 (_____/_____) *[SELLER(S) INITIALS]* I do NOT want any automated estimate of value on my listing.
153 Seller acknowledges that Seller has read and understands the options presented above and that, if Seller has selected the first option,
154 consumers who conduct searches for listings on the Internet will not see information about Seller's Property in response to their search.

155 **16. Title Insurance and Survey:** Seller acknowledges that Seller has not added to nor disposed of any part of the Property, or
156 gained any easements in favor of or against the Property not disclosed in the Title Guaranty Policy except as stated herein. Prior to
157 closing, Seller agrees to furnish at Seller's expense a title insurance commitment for an Owner's Title Insurance Policy in the amount
158 of the sale price, showing good title in the owner's name. After a sales contract has been signed, arrangements must be made to
159 secure title insurance and schedule the closing. Seller understands that Seller is not required to use any particular title insurance
160 company and that Seller or Seller's attorney may select any qualified licensed company for Seller's title insurance needs. Not less
161 than one (1) business day prior to closing, except where the subject property is a condominium, Seller may be required, at Seller's
162 expense, to furnish a Plat of Survey dated not more than six (6) months prior to the date of closing, prepared by an Illinois registered
163 land surveyor, showing any encroachments, measurements of all lot lines, all easements of record, building set-back lines of record,
164 fences, all building and other improvements on the real estate and distances therefrom to the nearest two lot lines. In addition, the
165 survey to be provided shall be a boundary survey conforming to the requirements of the Illinois Department of Financial and
166 Professional Regulation found at 68 Ill. Adm. Code, Sec. 170.56. The survey shall show all corners staked and flagged or otherwise
167 monumented. The survey shall have the following statement prominently appearing near the professional land surveyor seal and
168 signature: "This professional service conforms to the current Illinois minimum standards for a boundary survey. A Mortgage
169 Inspection, as defined, is not a boundary survey, and does not satisfy the necessary requirements."
170 With regard to the issuance of title insurance:
171 ☐ (_____/_____) *[SELLER(S) INITIALS]* Seller authorizes Brokerage to order title insurance and related services on Seller's behalf through
172 _____, an affiliate of Brokerage, for the estimated charges as disclosed in the Federal and State
173 Disclosure Statements provided Seller by Brokerage.
174 ☐ (**DS**/_____) *[SELLER(S) INITIALS]* Seller directs that _____ provide the title insurance and related services as stated above.
175 ☒ (**GM**/_____) *[SELLER(S) INITIALS]* Seller or Seller's attorney will make the necessary arrangements for title insurance and any related services.

**MM** _____
*Managing Broker Initial*

**GM** _____ _____
*Seller Initial*   *Seller Initial*

Address: **13890 Creek Crossing Dr, Orland Park IL 60467**

DocuSign Envelope ID: FE1D5D19-CF05-4069-9915-E8BD742D1463

Case 23-04789 · Doc 40-2 · Filed 09/28/23 · Entered 09/28/23 17:19:04 · Desc Exhibit 2 - Listing Agreement · Page 4 of 6

**17. Disclosure:** All inquiries about this Property made directly to Seller shall be immediately referred to Managing Broker and/or Seller's Designated Agent(s). Seller understands that the information which Seller provides to Seller's Designated Agent(s) as marketing information will be used to advertise Seller's Property to the public and submitted to the Multiple Listing Service. It is essential that this information be accurate and truthful. Seller agrees to comply with the provisions of the Illinois Residential Real Property Disclosure Act, the Illinois Radon Awareness Act and, if applicable, the Federal Lead Based Paint Disclosure Regulations. Seller shall complete the applicable disclosure document(s) in a timely manner, shall not knowingly provide false or inaccurate information therein, and shall comply with all local government ordinances. Although Seller is marketing Seller's Property in its present physical condition, Seller understands that Seller may be held responsible by a buyer for any latent or hidden, undisclosed defects in the Property which are known to Seller but which are not disclosed to buyer. Seller shall indemnify, save, defend and hold Brokerage, Managing Broker, and Seller's Designated Agent(s) harmless from all claims, disputes, litigation, judgments and/or costs (including reasonable attorney's fees), whether or not frivolous, arising from any misrepresentations made by the Seller, from any incorrect information supplied by the Seller, or from any material fact concerning the Property including latent defects which the Seller fails to disclose. Further, Seller shall indemnify, save, defend, and hold Brokerage, Managing Broker, and Seller's Designated Agent(s) harmless from any claim, loss, damage, or injury to any person or Property while viewing the Property arising from the condition of Seller's Property.

The current form residential sales contract contains the following representations to be made by Seller:

Seller represents that with respect to the Real Estate, Seller has no knowledge of, nor has Seller received any written notice from any association or governmental entity regarding:

a) zoning, building, fire or health code violations that have not been corrected;
b) any pending rezoning;
c) boundary line disputes;
d) any pending condemnation or Eminent Domain proceeding;
e) easements or claims of easements not shown on the public records;
f) any hazardous waste on the Real Estate;
g) real estate tax exemption(s) to which Seller is not lawfully entitled; or
h) any improvements to the Real Estate for which the required initial and final permits were not obtained.

Seller further represents that:

(_GM_ /____) *[SELLER(S) INITIALS]*   There *[CHECK ONE]* ☐ are ☒ are not improvements to the Real Estate which are not included in full in the determination of the most recent tax assessment.

(_GM_ /____) *[SELLER(S) INITIALS]*   There *[CHECK ONE]* ☐ are ☒ are not improvements to the Real Estate which are eligible for the home improvement tax exemption.

(_GM_ /____) *[SELLER(S) INITIALS]*   There *[CHECK ONE]* ☐ is ☒ is not an unconfirmed pending special assessment affecting the Real Estate by any association or governmental entity payable by Buyer after the date of Closing.

(_GM_ /____) *[SELLER(S) INITIALS]*   The Real Estate *[CHECK ONE]* ☐ is ☒ is not located within a Special Assessment Area or Special Service Area, payments for which will not be the obligation of Seller after the year in which the Closing occurs.

If the seller has any questions or concerns regarding the representation to be made in the sales contract, seller reserves the right to obtain legal advice.

**18. Limitations:** The sole duty of the Brokerage is to effect a sale of the Property. The Brokerage, Managing Broker, Seller's Designated Agent(s), members of the Multiple Listing Service(s) to which the Managing Broker belongs, and the Mainstreet Organization of REALTORS® are not charged with the custody of the Property, its management, maintenance, upkeep, or repair. Illinois law allows licensees to prepare the sales contract using approved preprinted forms, but does not allow licensees to draft other legal documents required to close the sale. Therefore, the Seller agrees to draft and furnish, or have Seller's attorney draft and furnish all other legal documents necessary to close the sale.

**19. Minimum Services:** Illinois Real Estate License Act of 2000, as amended provides that all exclusive brokerage agreements must specify that the sponsoring broker, through one or more sponsored licensees, must provide at a minimum, the following services: (1) accept delivery of and present to the client offers and counter-offers to buy, sell, or lease the client's property or the property the client seeks to purchase or lease; (2) assist the client in developing, communicating, negotiating, and presenting offers, counter offers, and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all contingencies are satisfied or waived; and (3) answer the client's questions relating to the offers, counter-offers, notices, and contingencies.

**20. Marketing Authorization:** Brokerage is authorized to advertise, promote, and market the Property which shall include, but not be limited to, in Managing Broker's sole discretion, the display of signs, placement of the Property in any Multiple Listing Service in which Managing Broker is a participant, and promotion of the Property through any electronic medium and/or on any Internet Website to which the Brokerage, Managing Broker and/or Designated Agent(s) may subscribe. Brokerage is authorized to affix a keybox to the Property, and provided the owner is absent, any MLS participant or subscriber associated with the Multiple Listing Service(s), whether acting as a buyer's representative or otherwise, shall have the right, through use of said keybox, to show the Property at any reasonable time.  It is not a requirement of the Multiple Listing Service or Brokerage that a Seller allow use of a keybox. Seller acknowledges that neither listing nor selling brokerage, the Mainstreet Organization of REALTORS®, nor any Multiple Listing Service is an insurer against the loss of Seller's personal property.  Seller is advised to safeguard or remove valuables now located on said Property. Seller is further advised to verify the existence of said valuables and obtain personal property insurance through Seller's insurance agent. Further, Seller hereby grants Brokerage and Brokerage shall have the right, and Seller acknowledges that Managing Broker may have an obligation under applicable Multiple Listing Service rules and regulations as a

_MM_ *Managing Broker Initial*   _GM_ *Seller Initial* _____ *Seller Initial*

Address: **13890 Creek Crossing Dr, Orland Park IL 60467**

condition of placing Seller's Property in such Multiple Listing Service, to release information as to the amount of selling price, type of financing, and number of days to sell the Property to any Multiple Listing Service of which Managing Broker is a participant at the time the Property is sold and closed.

**21. Taxes and Assessments:** All taxes and all usually prorated expenses shall be prorated pursuant to the terms of the sales contract. Seller shall disclose any assessments or special taxes for improvements or lien for improvements, either of record or in process, applicable to the Property marketed herein, and should the Seller receive any notice thereof, Seller agrees to notify the Managing Broker or Designated Agent(s) immediately.

a) SPECIAL ASSESSMENTS: **Seller represents that there:** *[CHECK ONE]* ☐ **is** ☒ **is not** a proposed or pending unconfirmed special assessment affecting the property not payable by Seller after the date of closing. Seller further represents that the following confirmed special assessments are not due or will be due after the date of closing: _____, 20__ in the amount of $_____.

b) SPECIAL SERVICE AREA: **Seller represents that the property:** *[CHECK ONE]* ☐ **is** ☒ **is not** located within a Special Service Area, payments for which will not be the obligation of Seller after the date of Closing.

c) CONDOMINIUM OR HOMEOWNERS' ASSOCIATION(S): **The property and improvements described herein** *[CHECK ONE]* ☒ **are** ☐ **are not** part of a Condominium or Homeowners' Association. If the property is part of a Condominium or Homeowners' Association, the contact information for such association is:

    Association Name: _____ Phone Number: _____
    Management Company Name: _____ Phone Number: _____

d) ASSOCIATION ASSESSMENTS/FEES: Seller acknowledges a current Condominium or Homeowners' Association Assessment/Fee of $_____ per _____ which includes: _____

e) ADDITIONAL ASSOCIATION ASSESSMENTS/FEES: Seller further acknowledges additional assessments/fees (such as a Master Association Fee) of $_____ per _____ which includes: _____
_____

**22. Earnest Money (choose one):**

☒ (GM /____) **(a) The Earnest Money shall be held by the Brokerage, as Escrowee in trust for**
*[SELLER(S) INITIALS]* **the mutual benefit of the Buyer and Seller (hereinafter "Parties") in a manner consistent with Illinois State Law. Upon initial closing, or settlement, the Earnest Money shall be applied first to the payment of any expenses incurred by the Brokerage on Seller's behalf in the sale, and second to payment of the Brokerage's sales commission, rendering the surplus, if any, to the Seller. If a dispute arises between the Parties to a real estate transaction as to whether a default has occurred, the Escrowee shall hold the Earnest Money and implement the procedure for disbursement as agreed in writing by the Parties in the real estate contract, or pay pursuant to subsequent joint written direction to Escrowee, or as directed by a court of competent jurisdiction. Further, Seller agrees that Escrowee may deposit the funds with the clerk of the Circuit Court by an action in the nature of interpleader. Seller agrees Escrowee may be reimbursed from the Earnest Money for all costs, including reasonable attorney's fees, related to the filing of the interpleader and hereby agrees to indemnify and hold Escrowee harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs, and expenses arising out of such default, claims, and demands. If Seller defaults, Earnest Money, at the option of Buyer, shall be refunded to Buyer, but such refunding shall not release Seller from the obligation of this Marketing Agreement.** Transfer of escrow money to the closing agent for the transaction may be made no sooner than two (2) business days prior to the scheduled closing date.

☐ (____/____) **(b) Brokerage maintains a policy of not holding earnest money or any moneys in**
*[SELLER(S) INITIALS]* **escrow for any reason. At the written direction of the Parties to a real estate transaction, Earnest Money deposited by a Buyer in the transaction shall be held in trust by an Escrowee selected by Parties. Escrowee shall be duly licensed and authorized to hold money in escrow for the mutual benefit of the Parties in a manner consistent with Illinois Law. In that event, the terms of a written agreement between Escrowee and the Parties to the real estate transaction shall control all issues regarding the holding and the disbursement of Earnest Money. If Seller defaults, any refunding of the Earnest Money to Buyer at Buyer's direction shall not release Seller from the obligation of this Marketing Agreement.**

**23. Amendments:** Should it be necessary to amend or modify this Agreement, facsimile or electronic signatures of all parties to this Marketing Agreement are accepted as original signatures. This Agreement may be executed in multiple copies and Seller's signature hereon acknowledges that Seller has received a signed copy.

**24. Mediation:** Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be mediated in accordance with rules then pertaining of the American Arbitration Association.

_____ Managing Broker Initial                                    GM Seller Initial _____ Seller Initial
Address: **13890 Creek Crossing Dr, Orland Park IL 60467**

*(Page 5 of 6 ) 6.2019 – © MAINSTREET ORGANIZATION OF REALTORS®*

**25. Indemnification:** Seller agrees to indemnify Brokerage, Managing Broker and Designated Agent(s) to save, defend, and hold them harmless on account of any and all loss, damage, cost, or expense (including reasonable attorney's fees) incurred by them arising out of this Agreement, or in the collection of fees or commissions due Brokerage pursuant to this Agreement, provided Brokerage is not found to be at fault.

**26. Disclaimer:** Seller acknowledges that Brokerage, Managing Broker and Seller's Designated Agent(s) are acting solely as real estate professionals, and not as attorney, tax advisor, surveyor, structural engineer, home inspector, environmental consultant, architect, contractor, or other professional service provider. Seller understands that such other professional service providers are available to render advice or services to the Seller, if desired, at Seller's expense.

**27. Costs of Third-Party Services or Products:** Seller is responsible for the costs of all third-party products or services such as surveys, soil tests, title reports, well and septic tests, etc.

**28. Lease of Property:** Although the purpose of this Agreement is to bring about a sale, option, or exchange of the Property, Seller agrees to pay Brokerage a leasing commission of $ _____ if the Property is leased within the marketing period. If the tenant to whom the Property is leased later purchases the Property, Seller agrees to pay Brokerage a sales commission of _____ on the full sale price. If the property is to be marketed for lease, a separate exclusive listing agreement for lease will need to be agreed upon by the parties to this agreement.

**29. Severability:** In case any one or more provisions of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

**30. Notice**: All notices required shall be in writing and shall be served by one party to this agreement to the other party. Notice to any one of the multiple-person party shall be sufficient notice to all. Notice shall be given in the following manner:

a) By personal delivery of such notice; or
b) By mailing of such notice to the addresses recited herein by regular mail and by certified mail, return receipt requested. Except as otherwise provided herein, notice served by certified mail shall be effective on the date of mailing; or
c) By sending facsimile transmission. Notice shall be effective as of date and time of facsimile transmission, provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time). In the event fax notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the first business day after transmission; or
d) By sending e-mail transmission. Notice shall be effective as of date and time of e-mail transmission, provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time), and provided further that the **recipient provides written acknowledgment to the sender** of receipt of the transmission (by e-mail, facsimile, or by regular mail). In the event e-mail notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the first business day after transmission; or
e) By commercial overnight delivery (e.g., FedEx). Such Notice shall be effective on the next Business Day following deposit with the overnight delivery company.

**31. Entire Agreement:** This Agreement constitutes the complete understanding and entire agreement between the parties relating to the subject thereof, and any prior agreements pertaining thereto, whether oral or written, have been merged and integrated into this Agreement. **This Agreement may not be terminated or amended prior to its termination date without the express written consent of both parties to this Agreement.**

Seller hereby acknowledges receipt of a signed copy of this Agreement and all attachments. The attachments include the following [*HERE LIST ALL ATTACHMENTS*]: **Standard Disclosures**

*[SIGNATURES REQUIRED OF ALL WHO HAVE A LEGAL OR EQUITABLE INTEREST IN THE PROPERTY.]*

**Infiniti Proeprties Inc/ mark McGee**
MANAGING BROKER *[PRINT]*

*Mark McGee* (DocuSigned)
MANAGING BROKER *[SIGNATURE]*
07/10/2023
DATE

*Gail Abuarab* (DocuSigned)
DESIGNATED AGENT *[SIGNATURE]*
07/10/2023
DATE

**9566 W 147th St**
OFFICE ADDRESS
**Orland Park    IL            60462**

**708-743-3439**
DESIGNATED AGENT PHONE    FAX
**708-206-3000**
OFFICE PHONE
**soldbygail@live.com**
E-MAIL ADDRESS

*MM* (DS) Managing Broker Initial
Address: **13890 Creek Crossing Dr, Orland Park IL 60467**

*Galeb Mizyed* (DocuSigned)
SELLER *[SIGNATURE]*
**13890 Creek Crossing DR. Orland Park.IL.60467**
CURRENT MAILING ADDRESS *[REQUIRED]*
07/10/2023
DATE

_____
PHONE                FAX

_____
E-MAIL ADDRESS
*FOR INFORMATION ONLY:*

_____
SELLER'S ATTORNEY NAME

*GM* (DS) _____ Seller Initial _____ Seller Initial
PHONE/E-MAIL ADDRESS